David J. Cohen, Esq.
Cohen Forman Barone, LLP.
950 Third Avenue, 11th Fl
New York, New York 10022
Attorneys for Defendant
Benjamin Lucre


IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 18-CR-420-012 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MOTION TO REDUCE SENTENCE** |
| v. | ) | **PURSUANT TO 18 U.S.C.** |
| | ) | **§ 3582(c)(1)(A)(i) (COMPASSIONATE** |
| Benjamin Lucre, | ) | **RELEASE)** |
| | ) | |
| Defendant-Movant. | ) | |
| _____ | ) | |

##### I.   Introduction

The defendant, Benjamin Lucre, through his attorneys, respectfully moves this Court pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) to reduce his sentence to time served and allow him to begin his supervised release time in home confinement. In the alternative, we request that this Court allow Mr. Lucre to serve the remaining balance of his sentence in home confinement, to be immediately followed by supervised release. As amended by the First Step Act, the compassionate release statute allows courts to reduce sentences for "extraordinary and compelling" reasons. Mr. Lucre suffers from severe persistent asthma. His health condition, combined with the growing coronavirus pandemic, provide an extraordinary and compelling basis for a sentence reduction. Mr. Lucre is incarcerated at the Federal Correctional Center at Danbury ("FCI Danbury"). This is a minimum security federal correctional institution located in Danbury, Connecticut, within the New York City metropolitan area, which has become the epicenter of the nation's struggle with COVID-19. FCI Danbury is the site of one of the worst COVID-19 outbreaks at BOP facilities nationwide. As of April 15, 2020, at least 44 prisoners and 39 staff members have or had tested positive for COVID-19. One inmate has died.[1]

Mr. Lucre does not object to this Court modifying his term of supervised release to include home confinement for the period of time equal to the remaining term of incarceration he would serve without this Court's modification order.  Such a modification will effectively allow him to finish the remaining portion of his prison sentence in home confinement, which will in turn allow him to protect himself and others from the spread of the novel coronavirus 2019 ("COVID-19") by sheltering in place at his residence.

---

[1] (*See* Laura Cassels, *COVID-19 deaths in federal prisons rise to 15; about 700 staff and inmates* sick, Phoenix, April 15, 2020, https://www.floridaphoenix.com/2020/04/15/covid-19-deaths-in-federal- prisons-rise-to-15-about-700-staff-and-inmates-sick/ )

## II.     Background

On October 8, 2019 this Court sentenced Mr. Lucre to sixty months of incarceration with four years of supervised release to follow for Conspiracy to Distribute and Possess with Intent of a Controlled Substance. He has been incarcerated since the day of his arrest, June 20, 2018, as his family was unable to post bond for him. On February 4, 2020, he was transferred to FCI Danbury. Mr. Lucre remains incarcerated at Danbury Prison for the foreseeable future because, with very limited exceptions not applicable here, the Federal Bureau of Prisons (BOP) has suspended prisoner transfers due to the spread of COVID-19.[2]

## III.     Discussion

### A.  This Court Has Authority To Consider Mr. Lucre's Motion.

Although the compassionate release statute previously permitted sentence reductions only upon motion of the Director of the Bureau of Prisons (BOP), Congress expanded the statute in the First Step Act of 2018. Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018). As amended, § 3582(c)(1)(A)(i), now permits courts to consider motions filed by the defendant if "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

The reason for the expansion to include defense-filed motions was the "documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants." *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020). Accordingly, "while the First Step Act did preserve the BOP's role relative to a sentence reduction in certain limited respects, it eliminated the BOP Director's role as the exclusive channel through which a sentence reduction could be considered by courts." *Id.* (emphasis in original).  As set forth below, exhaustion of administrative remedies should be waived in this case.

---

[2] See BOP Implementing Modified Operations, available at https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed April 8, 2020).

1.  **The Court Can Waive the Requirement For Exhaustion of Administrative Remedies Under 18 U.S.C. 3582(c)(1)(A) Because Of The Urgent Risk of Fatal Infection.**

Mr. Lucre filed his petition with the Warden at FCI Danbury on April 1, 2020. On April 15, 2020, Mr. Lucre received a response stating Mr. Lucre's "….concern about being potentially exposed to or possibly contracting COVID-19 does not currently warrant an early release from [his sentence]." The prison required Mr. Lucre to follow up with RIS if he believed he met the criteria. Despite being denied access to RIS for weeks, Mr. Lucre ultimately gained access and made the request immediately. When Mr. Lucre followed up with a BOP request to RIS, he was informed that he does not meet the BOP standard for release. Mr. Lucre reports being informed that his denial according to BOP was because he had not served enough of his sentence. Notably, the denial did not deny he was part of the class of vulnerable population, only that he did not serve enough of his non-violent drug conviction sentence.

Mr. Lucre would ordinarily be required to exhaust all administrative remedies prior to approaching the Court, whichever happens earlier. See 18. U.S.C. 3582(c)(1)(A). However, the Court may waive these administrative requirements, and should so here.

Federal courts have the statutory authority to modify an imposed term of imprisonment for two reasons: compassionate release under 18 U.S.C. § 3582(c)(1) or based on a change in the sentencing guidelines under 18 U.S.C. § 3582(c)(2). Until the First Step Act was passed in December of 2018, motions for compassionate release could only be brought to the Court by the Director of the Bureau of Prisons. However, after the December 2018 passage of the First Step Act, defendants may now bring their own motions for compassionate release after exhausting administrative remedies within the Bureau of Prisons. 18 U.S.C. § 3582(c)(1)(A).

Normally, a defendant exhausts his or her administrative remedies by requesting that the warden of his or her BOP institution move for a reduced sentence on his or her behalf and then either (a) having the request granted, (b) having the request denied and appealing through the BOP's administrative remedies program, or (c) having the request remain pending for 30 days without a decision by the warden, after which the defendant can file his/her motion for a reduction in sentence directly with the district court. 18 U.S.C. § 3582(c)(1)(A).  The district court in this matter is authorized to rule on the defendant's motion for a reduction in sentence.    4

**2.  In the Alternative, Mr. Lucre Does Not Have to Exhaust Administrative Remedies Because the Delay it Would Require Could Cause Catastrophic Health Consequence.**

Alternatively, this Court should excuse compliance with the normal BOP's administrative exhaustion requirements, which take at least 30 days and can go on much longer, given the documented and serious national emergency. *See Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (*quoting Granberry v. Greer*, 481 U.S. 129, 134 (1987)) (recognizing that "exceptional circumstances of peculiar urgency" can excuse exhaustion). In *United States v. Powell,* the Court found that requiring the defendant, who suffered from respiratory problems including Asthma, to first seek relief through the BOP's administrative process would be futile. Just as the Court found in *United States v. Powell*, this Court should waive the administrative process through BOP as it would be futile and could cause catastrophic health consequences to Mr. Lucre.

As several district courts have recognized in recent weeks, waiver of any exhaustion of administrative remedies requirement is justified, given the extraordinary threat posed by the quickly spreading COVID-19 pandemic, particularly as to those prisoners in a high-risk group who are confined in a detention facility. *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (excusing exhaustion requirement because "[e]ven a few weeks' delay carries the risk of catastrophic health consequences" for prisoners in high risk group); *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at *4 (S.D.N.Y. Apr. 3, 2020) (waiving exhaustion requirement, given defendant's advanced age, health conditions putting him in a high risk group for complications and death resulting from COVID-19, and fact that he was in a detention facility where prisoners live in crowded conditions); *United States v. Perez*, No. 17 Cr. 513-3, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (waiving § 3582(c)(1)(A)'s exhaustion requirement where delay carried the risk of the vulnerable defendant contracting COVID-19); *United States v. Colvin*, No. 19 Cr. 179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) ("[I]n light of the urgency of [d]efendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences, the [c]ourt waives the exhaustion requirement of Section 3582(c)(1)(A)."); *United States v. Powell*, 94 Cr. 316, ECF No. 98 (D.D.C. Mar. 28, 2020)

(waiving exhaustion under § 3582(c)(1)(A) where the [c]ourt found that "requiring defendant to first seek relief through the [BOP] administrative process would be futile"); *see also Matter of Extradition of Toledo Manrique*, No. 19-MJ-71055, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (refusing to delay consideration of release to await evidence of an outbreak in the jail because that "may be too late").

Waiver of any administrative exhaustion requirement is justified here because of Mr. Lucre's vulnerable medical condition and the alarming speed at which COVID-19 is spreading, especially at FCI Danbury,

### B. The COVID-19 Outbreak Presents A Compelling And Extraordinary Circumstance that Warrants Compassionate Release For Mr. Lucre, who is a High-Risk Inmate.

The compassionate release statute does not expressly define or limit what constitutes an "extraordinary and compelling" reason for a sentence reduction. Black's Law Dictionary, however, defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common," BLACK'S LAW DICTIONARY (11th ed. 2019). Its definition of "compelling need," is one "so great that irreparable harm or injustice would result if [the relief] is not [granted]." *Id*. The present global pandemic is a quintessential extraordinary circumstance beyond what most Americans have experienced in their lifetimes. Based on his severe asthma, Mr. Lucre is among those most at risk of serious illness or death if he is exposed to coronavirus in custody. Thus, the combination of circumstances provides a compelling reason for Mr. Lucre's immediate release.

### 1. The Court has authority to find extraordinary and compelling reasons other than those expressly identified in commentary to U.S.S.G. § 1B1.13.

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The policy statement issued in exercise of that authority, U.S.S.G. § 1B1.13, provides examples of "extraordinary and compelling reasons" only in the application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced

6

age and deteriorating health combined with the amount of time served, or (4) compelling family circumstances. U.S.S.G. § 1B1.13 comment. n.1(A)-(C). The commentary also includes a fifth catch-all provision for "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons. U.S.S.G. § 1B1.13, comment. n.1(D).

However, the policy statement was last amended in November 2018, before the First Step Act was passed, and it still requires a motion filed by the BOP. For that reason, "a growing number of district courts have concluded the Commission lacks" a policy statement applicable to the post-First Step Act statute. *United States v. Mondaca*, No. 89-CR-0655 DMS, 2020 WL 1029024 (S.D. Cal. Mar. 3, 2020) (internal quotation marks omitted); *see also United States v. Brown*, 411 F. Supp. 3d 446, 449-50 (S.D. Iowa 2019) (citing cases). In *United States v. Cantu*, the Court explained:

> Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582.

*United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (emphasis in original). Similarly, in *Redd*, the court noted that § 1B1.13 "by its terms applies only to motions for compassionate release filed by the BOP Director, not motions filed by defendants." *Id.*, 2020 WL 1248493, at *6. Therefore, the Court concluded, "there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'" *Id.*

Even where courts have not deemed § 1B1.13 entirely inapplicable due to the lack of amendment, they have held that judges have authority based on the catch-all provision in Application Note 1(D) to find extraordinary and compelling reasons other than those listed. *See, e.g.*, *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, *3 (D. Me. July 11, 2019) (stating that the existing policy statement provides "helpful guidance," but "is not ultimately

conclusive given the statutory change"). In *Redd*, the court explained that "Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance." *Redd*, 2020 WL 1248493, at *7 (citing cases); *see also United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) ("[A] majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." (internal quotation marks omitted)).

The government conceded this point in *United States v. Young*, agreeing that "the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act." *United States v. Young*, No. 2:00-CR-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020). The court in *Young* followed the majority of district courts in recognizing that § 1B1.13's defined categories are not exclusive: "In short, federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction." *Id*.[3]

Accordingly, this Court has authority to consider whether the worsening global pandemic, combined with the other relevant circumstances in this case, present an extraordinary and

---

[3] *See also United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, at *2 (D. Kan. Feb. 21, 2020); *United States v. Maumau*, No. 2:08-cr-00758-TC-11, 2020 WL 806121, at *2-3 (D. Utah Feb. 18, 2020) ("[A] majority of district courts to consider the question have embraced Mr. Maumau's position" that limiting the catch-all provision to circumstances identified by the BOP is inconsistent with the law) (citing ten other cases); *Brown*, 411 F. Supp. 3d at 451 ("[I]f the [First Step Act] is to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it. . . . Thus, the Director's prior interpretation of 'extraordinary and compelling' reasons is informative, but not dispositive." (internal quotation marks and citations omitted)); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

compelling basis for a sentence reduction, whether or not it falls within one of the existing categories in § 1B1.13 commentary.

**1. COVID-19 is an Unprecedented and Rapidly-Expanding Global Health Emergency That Presents a Serious Risk to Vulnerable Prisoners.**

On March 11, 2020, the World Health Organization officially classified the new strain of coronavirus which causes COVID-19 as a pandemic. *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS. COVID-19 is a serious disease that makes certain populations of people severely ill and can lead to death. About 20% of COVID-19 patients require hospitalization, about 10 times more than the percentage of patients with the flu.  Pien Huang, How The Novel Coronavirus And The Flu Are Alike ... And Different, *www.npr.org* (Mar. 20, 2020) at https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flu-are-alike-and-different. It estimated to kill at least 10 people per thousand infected, making it ten times more lethal than the seasonal flu. *Id*.[4]

As of May 4, 2020, COVID-19 has infected over 3 million people worldwide, leading to 248,025 deaths. New York City alone has experienced over 18,000 deaths. *Coronavirus COVID-19 Global Cases*, Center for Systems Science and Engineering (CSSE) at Johns Hopkins University, https://coronavirus.jhu.edu/map.html (last visited May 4, 2020) (updating regularly). On March 26, 2020, the United States became the global leader in COVID infections. Tom Porter, *The US is Well on the Way to Having a Coronavirus Outbreak Worse than China's or Even Italy's*, Business Insider (Mar. 26, 2020), https://www.businessinsider.com/figures-show-us-soon-coronavirus-worse-china-2020-3. The number of confirmed COVID-19 cases continues to rise

---

[4] *See also* Nick Wilson et al., *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26 EID Journal (prepublication June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0320_article.

exponentially, but reported numbers underrepresent the true scope of the crisis—"experts believe that the United States still isn't testing enough people to detect the outbreak's true spread."[5]

The severity of the coronavirus pandemic is reflected in the actions of local and national leaders, who have taken drastic measures to prevent the spread of the disease. All 50 states and the national government have declared states of emergency. *See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/. Kamran Rahman & Alice Miranda Ollstein, *How States Are Responding to Coronavirus, in 7 Maps*, POLITICO (Mar. 24, 2020), https://www.politico.com/news/2020/03/24/coronavirus-state-response-maps-146144. Additionally, more than half of the states and the District of Columbia have imposed severe "lockdown" rules for their citizens. Porter, *supra*.

Conditions of imprisonment create the ideal environment for the transmission of contagious diseases. Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 CLINICAL INFECTIOUS DISEASES 1047, 1047 (2007), https://doi.org/10.1086/521910. "Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced." Centers for Disease Control and Prevention (CDC), *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. The CDC recognizes the difficulty of preventing the introduction of COVID-19 into prison facilities:

---

[5] Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an American Catastrophe*, THE ATLANTIC (Mar. 21, 2020), https://www.theatlantic.com/health/archive/2020/03/how-many-americans-are-sick-lost-february/608521/

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

*Id*.

Crowding, inadequate ventilation, and security issues all contribute to the spread of infectious disease in jails and prisons. Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators. Hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission rates, is contraband in jails and prisons because of its alcohol content. Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is a Contraband?*, ABA JOURNAL (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus. Additionally, incarcerated people tend to be in poorer health than the general population. According to a recent Bureau of Justice Statistics study, approximately half of state and federal prisoners and jail inmates have chronic conditions such as cancer, high blood pressure, diabetes, cirrhosis of the liver, heart disease, and asthma.[6] Medical care of prisoners is limited at the best of times.[7]

---

[6] Laura M. Maruschak et al., Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12, BUREAU OF JUSTICE STATISTICS, NCJ 248491, 1 (Rev. Oct. 4, 2016), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf .

[7] *See* U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf (finding that the BOP experienced chronic medical staff shortages and failed to take adequate measures to address them, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions); U.S. Dep't of Justice Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf (finding that BOP facilities and services, including medical services, were inadequate to meet the needs of an aging prison population leading to delays in medical treatment for prisoners with acute and chronic heart and neurological conditions, who wait an average of 114 days to see medical specialists); David Patton, S*tatement from Federal Defenders of New*

Because of these dangers, the public health community is insistent on the critical need to rapidly reduce our prison populations, both for the health of our inmates and the health of the community as a whole.  "We need to take the unprecedented step TODAY of providing urgent release to everyone in the jails who is at risk of serious morbidity and mortality from COVID." Jennifer Gonnerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Coronavirus*, THE NEW YORKER (Mar. 20, 2020) (quoting Rachael Bedard, Rikers Island Geriatrician), https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-to-save-her-elderly-patients-from-the-coronavirus.

Similarly, on March 23, 2020, a bipartisan group of fourteen senators wrote to Attorney General Barr and the Director of the Bureau of Prisons to express "serious concern for the health and wellbeing" of those inmates "most vulnerable to infection."[8] They noted that "[c]onditions of confinement do not afford individuals the opportunity to take proactive steps to protect themselves, and prisons often create the ideal environment for the transmission of contagious disease." *Id*. The senators called on the BOP to use existing tools like the elderly prisoner home confinement program and compassionate release to discharge vulnerable inmates from prison. *Id*. *Id*. **Additionally, due to the conditions in and around FCI Danbury, this facility is among the federal prisons that Attorney General Barr singled out in his April 3 directive to release more inmates and utilize home confinement.** General Barr directed the BOP in urgent terms to immediately review all inmates who have COVID-19 risk factors, specifically at FCI Danbury. Mr. Lucre is among those individuals at Danbury who is at the highest risk. Because of the prison's

---

*York*, FEDERAL DEFENDERS OF NEW YORK (Mar. 8, 2020), https://federaldefendersny.org/about-us/news/statement-from-federal-defenders-of-new-york.html.
[8] Letter from Senator Charles Grassley et al. (Mar. 23, 2020) (available at https://www.grassley.senate.gov/sites/default/files/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%20and%20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks.pdf.

lack of urgency to release inmates and utilize home confinement, U.S. District Court Judge Shea has ordered the prison to speed up the release and implement a system to speed the release of inmates.[9]

FCI Danbury is in the center of the global COVID-19 storm. The United States currently has the greatest number of infections of any country in the world. And, furthermore, the New York City metropolitan area, in which FCI Danbury is located, is currently at the epicenter of the COVID- 19 pandemic in this country. As of April 27, 2020, there are over 422,000 positive cases of COVID-19 in New York, Connecticut and New Jersey. As of that date, there have been 30,000 deaths in those three states, representing 55% of the total confirmed deaths from COVID-19 reported Nationwide.[10] In New York City and the seven counties most proximate to FCI Danbury (Westchester, Putnam, Duchess and Nassau counties in New York and Fairfield, Litchfield and New Haven counties In Connecticut), there were an aggregate of 242,000 cases of COVID-19 and 21,0000 deaths.[11] As of May 14, 2020 in Fairfield County, where FCI Danbury is located, there were 13,646 confirmed cases of COVID-19 and 1,068 deaths associated with COVID-19.[12]

It is evident that COVID-19 is at Danbury and individuals inside and outside the prison are infected. However, what we don't know is how many currently have the infection or have been exposed. There is currently no information provided from the BOP about the number of tests that are actually administered at FCI Danbury. Furthermore, there is no information as to the method or criteria for which the prison determines who and whether to perform COVID-19 testing.

---

[9] *Dianthe Martinez-Brooks et all., v. D. Easter & Michael Carvajal*, United States District Court District of Connecticut, May 12, 2020.
[10] COVID-19 Dashboard by the Center for systems Science and Engineering (CSSE) at Johns Hopkins University (JHU), https://coronavirus.jhu.edu/us-map.
[11] ID.
[12] ID.

Additionally, FCI Danbury is grossly ill-equipped to identify, monitor and track COVID-19 epidemic. As Mr. Lucre describes his conditions of confinement, defendant lives in a unit with approximately 60 other inmates. In this unit, there are only 2 urinals, 4 regular bathroom stalls and 4 showers. Furthermore, the beds are so close together that Mr. Lucre can touch the bed next to him by spreading his arms out. Soap and water are available for hand washing; however, inmates also use the same sinks and soap to clean clothes and dishes so it constantly runs out, making it difficult for inmates to wash their hands as often as the CDC recommends. Furthermore, there are 2 phones in a small room for the inmates to share and 2 TV rooms where inmates gather together. Clearly, prisoners are unable to comply with the CDC's guidelines for physical distancing. The combination of an epidemic striking a facility that houses over 1,000 people and FCI Danbury's inability to provide appropriate medical care under the best of circumstances is likely to result in serious illness and death if drastic measures are not taken to reduce the population there.

**2.  Mr. Lucre Runs a High Risk of Serious Illness or Death if He Contracts COVID-19.**

The CDC and other medical authorities have clarified that COVID-19 is especially dangerous for both older people and people with severe chronic medical conditions. *See* CDC, *Older Adults* (Mar. 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications/older-adults.html. Those with certain serious health concerns—including chronic lung disease, moderate to severe asthma, compromised immune systems, severe obesity, diabetes, renal failure, and liver disease—are especially vulnerable to and at higher risk for serious complications from COVID-19, including death. *See* CDC, *Information for Healthcare Professionals:   COVID-19   and   Underlying   Conditions*   (Mar.   22,   2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html.

In *United States v. Phillip Smith,* the Court granted the defendants motion for release due to the defendants age, health, and status as a "high-risk" inmate, who is especially vulnerable to contracting COVID-19. Like the defendant in that case, the defendant here, Mr. Benjamin Lucre, has asthma. Mr. Lucre's asthma is severe.  The Court in *Phillip Smith*, reasoned that "COVID-19 presents a heightened risk for incarcerated defendants ... with respiratory ailments such as asthma. The Centers for Disease Control warns that persons with asthma are at high risk of serious illness if they contract the disease. Further, the crowded nature of municipal jails ... present an outsize risk that the COVID-19 contagion, once it gains entry, will spread. And, realistically, a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself." *United States v. Hernandez,* No. 18 Cr. 834 (PAE), 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020) (footnotes omitted).

Because of Mr. Lucre's severe persistent asthma, he is a high-risk inmate. As such, he is among those with the highest risk of death or serious illness from COVID-19. Yet, as an incarcerated person, it is impossible for Mr. Lucre to follow the CDC's recommendations to protect himself from exposure to this highly-transmissible disease.

Mr. Lucre has been suffering from this condition his entire life, as he has had multiple serious hospital stays due to his asthma. On January 2, 2018, prior to his time in prison, he was admitted into the Pediatric Intensive Care Unit at NYC Lincoln Medical Center due to his condition. (See attached). Furthermore, while in prison, Mr. Lucre has needed extra medical care. In March, 2020, Mr. Lucre was experiencing symptoms of shortness of breath, wheezing and tightness in his chest. Because of this, he was given a nebulizer treatment by medical personnel in prison. Mr. Lucre has suffered from these symptoms on other occasions, however, he does not always receive the treatment that he needs from the medical personnel in prison. At times, Mr.

15

Lucre has complained that he has had trouble breathing, however, has received little to no medical care. Under normal circumstances there is a higher risk of severe medical complications for Mr. Lucre, under present conditions the risk of serious physical injury or death is real.

While in prison, Mr. Lucre is on a regular albuterol asthma pump and on an Asmanex Twisthaler, containing medicine called mometasone furoate, which is used as maintenance treatment that helps prevent and control his asthma symptoms. Mr. Lucre uses his asthma pump every day, multiple times a day. In addition, he uses the Asmanex Twisthaler every day, twice when he wakes up and twice before bed. COVID-19 presents a heightened risk for individuals with respiratory ailments, such as Mr. Lucre. In prison it is well known that at times for reasons both justified and unjustified inmates are unable to access their medications and medical needs. If Mr. Lucre, for any reason whatsoever, did not have access to his inhaler the risk of serious health consequences, including death, grow exponentially.  This risk of serious illness or death from the unprecedented global pandemic, together with all of the other relevant factors in this case, presents an extraordinary and compelling basis for a sentence reduction.

**4. Courts Responding to the Coronavirus Pandemic Have Recognized the Critical Importance of Reducing Incarcerated Populations.**

The Court's responses to COVID-19 reflects the extreme exigency of the present circumstances, especially for those individuals most vulnerable to harm from the virus.  Numerous courts have granted compassionate release to prisoners whose age and health conditions place them in a high-risk group for serious illness or death from COVID-19.[13]  In *United States v. Garlock*, for example, the district court extended the defendant's date for surrendering to serve an already-imposed prison sentence until September 1, 2020, concluding that no one should be entering BOP custody absent "truly extraordinary circumstances":

> By now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided. Several recent court rulings have explained the health risks—to inmates, guards, and the community at large—created by large prison populations. . . . The chaos has already begun inside federal prisons—inmates and prison employees are starting to test positive for the virus, quarantines are being instituted, visits from outsiders have been suspended, and inmate movement is being restricted even more than usual. . . . To avoid adding to the chaos and creating unnecessary health risks, offenders who are on release and scheduled to surrender to the Bureau of Prisons in the coming months should, absent truly extraordinary circumstances, have their surrender dates extended until this public health crisis has passed.

*United States v. Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020).

---

[13] *See United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *1 (D. Conn. Apr. 8, 2020) (approving compassionate release where defendant was 65 and had COPD and asthma); United States v. Eric Sedge, 2020 WL 2475071 (E.D.N.Y.  May 13, 2020)(Where the defendant's motion for compassionate release was granted at FCI Danbury where the defendant's medical conditions placed him at a greater risk of suffering life threatening complications); *United States v. Smith*, 2020 WL 1849748 (S.D.N.Y. April 13, 2020)(finding the defendant with asthma, high cholesterol, blood clots eligible for compassionate release); *United States v. Kringlstein*, No. 16 - cr-633, ECF. 60 (D.N.M. Apr. 27, 2020)(Where the defendant was released after testing positive for COVID-19); *United States v. Hansen*, No. 07-CR-00520(KAM), 2020 WL 1703672, at *9 (E.D.N.Y. Apr. 8, 2020) (granting compassionate release where defendant was over 65 and had numerous ailments); *Gonzalez*, 2020 WL 1536155, at *3 (approving compassionate release where defendant "is in the most susceptible age category (over 60 years of age) and her COPD and emphysema make her particularly vulnerable"); *United States v. Hernandez*, No. 18-CR-834, 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020) (finding "extraordinary and compelling reasons" to reduce the defendant's sentence due to defendant's asthma and the "heightened medical risk presented to [the defendant] by the COVID-19 pandemic"); *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *2 (E.D. Pa. Apr. 1, 2020) (granting compassionate release because for a diabetic inmate, "nothing could be more extraordinary and compelling than this pandemic"); *United States v. Campagna*, No. 16-CR-78-01, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) ("Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify to Defendant's sentence on the grounds that he is suffering from a serious medical condition that substantially diminishes his ability to provide self-care within the environment of the RCC."); *Perez*, 2020 WL 1546422, at *2 ("Perez meets th[e] requirement [of Application Note 1(D) ] as well, because he has weeks left on his sentence, is in weakened health, and faces the threat of a potentially fatal virus. The benefits of keeping him in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave.").

In *United States v. Copeland*, the Court granted a sentence reduction to time served under another portion of the First Step Act to a defendant serving a life sentence for a drug trafficking conspiracy and firearm possession. *United States v. Copeland*, No. 2:05-cr-00135-DCN (D.S.C. Mar. 24, 2020) (ECF No. 662). The court recognized that the defendant's "tenuous health condition" put him at "even higher risk for severe illness and possible death" from the COVID-19 pandemic. *Id*. at 7. The court considered letters from members of Congress as evidence of its "desire for courts to 'use all available powers and authorities . . . to reduce the number of federal prisoners in . . . prisons,'" especially for elderly and sick individuals and those within the last 36 months of their sentences who are appropriate for placement in home confinement. *Id*. (quoting Letter of House Judiciary Committee, Mar. 19, 2020).

Similarly, in *Toledo Manrique*, the district court granted bail in an extradition matter, although the individual faced a life sentence in Peru. 2020 WL 1307109, at *1. Noting that Toledo Manrique is 74 years old, the Court concluded, "[t]he risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail." *Id*.

A sampling of the court orders granting release based on the pandemic fails to convey the full volume of building precedent. *See, e.g.*, *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at *1 (E.D. Mich. Mar. 27, 2020) ("[T]he danger posed to Defendant in the Saginaw County Jail by the COVID-19 pandemic constitutes an independent compelling reason to temporarily release him from custody."); *United States v. Michaels*, No. SACR 16-76-JVS, 2020 WL 1482553, at *1 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i)); *United States v. Jaffee*, No. 19-cr-00088-RDM (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in

jail and "real" risk of "overburdening the jail's healthcare resources"); *United States v. Harris*, No. CR 19-356, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should [h]e contract COVID-19"); *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, __ F. Supp. 3d __, at *2 (S.D.N.Y. Mar. 19, 2020) (releasing defendant, given "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic").

**5. With Full Consideration of the § 3553(a) Factors, Including the COVID-19 Pandemic, Mr. Lucre Time Served Constitutes a Sentence Sufficient, But Not Greater Than Necessary, To Accomplish the Goals of Sentencing.**

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Under all of the circumstances in this case, the Court should conclude that the time that Mr. Lucre has already served is sufficient to satisfy the purposes of sentencing. Under *Pepper v. United States*, 562 U.S. 476, 490-93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a).

Here, the overriding factor under § 3553(a) which was not present at the time of sentencing is the COVID-19 pandemic and the serious risks it presents. Although the circumstances of the present offense qualified Mr. Lucre for the serious sentence this Court originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness. Indeed, when this Court sentenced Mr. Lucre to 60 months of incarceration, it did not intend for his life to be at risk. In fact, the Eighth Amendment's prohibition on cruel and

unusual punishment includes unreasonable exposure to dangerous conditions in custody. *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to contagious diseases caused by overcrowding conditions). The § 3553(a) factors can be met in this case by an order of home confinement as a condition of supervised release. Or, by allowing him compassionate release so he can serve the remainder of his prison term in home confinement would also meet the goals of sentencing.

Additionally, Mr. Lucre's conduct while incarcerated establishes that the purposes of punishment have been met. Under *Pepper*, the Court must also consider "the most up-to-date picture" of the defendant's history and characteristics, which "sheds light on the likelihood that [the defendant] will engage in future criminal conduct." 562 U.S. at 492. Mr. Lucre has been enrolled in the GED program at Danbury. Mr. Lucre is doing all that he can in prison to better himself for when he leaves prison and enters society as a productive citizen. Although Mr. Lucre had some troubles during his teenage years, including drug use issues, he has no prior criminal history and is a non-violent offender. Mr. Lucre has shown by his conduct during his incarceration that he no longer threatens public safety and that granting him compassionate release would not endanger the community.

The totality of the circumstances demonstrates that reducing Mr. Lucre's sentence to time served after 23 months in custody, is "sufficient, but not greater than necessary," to serve the purposes of sentencing under § 3553(a).

Furthermore, Mr. Lucre has a release plan to ensure his safe transition to the community. Mr. Lucre will live with the mother of his child, AnaMaria Pizarro, his 3-year-old daughter and Ms. Pizarro's mother. They will be living in Ms. Pizarro's mother's home in the Bronx, New York.

When he arrives there, he will have a bedroom to himself where he will be able to quarantine for 14 days in isolation. Ms. Pizarro will be able to bring meals to Mr. Lucre's room, allowing him to remain isolated at the home and not expose anyone else in his family.  Additionally, Mr. Lucre will be living in a different community from where he lived when he was arrested. In this new environment, he will be able to re-enter society without the shadows of his past in front of him. Mr. Lucre would also like the opportunity to care for his young daughter, which up until now, he has not had much time with. He is eager to be active in her everyday life and better himself so that he can provide for her.

Additionally, as earlier discussed, Mr. Lucre has been participating in a GED program while in prison. He was supposed to have completed the program by now, however, due to the virus the program has been postponed. He plans to finish the GED program once his supervised release begins. When given the opportunity to transition into the community, Mr. Lucre will have the support of his mother, Ms. Areli Morillo, the mother of his child and her mother, to ensure that he creates structure in his everyday life. They have all agreed to work collectively and collaboratively to ensure that he participates in mental health treatment as well as a drug treatment program and follows all the Court and probation's mandates of release.

At the time of sentencing, this Court received character and support letters from his Aunt Julie, his Uncle Gary Moye and his previous swim coach, Ignacio Sanchez. In addition to his family, Mr. Lucre will have the support of the above-mentioned individuals just as they promised at the time of sentencing.

Furthermore, Mr. Lucre was a certified Lifeguard and worked with Ignacio Sanchez as a Lifeguard at the Boys and Girls Club. He plans to recertify so that he can continue his work in the

community as a Lifeguard. In addition, Mr. Lucre plans to get his OSHA certification to work in construction in order to create stability in his life and provide for his daughter.

## I. Conclusion

For the foregoing reasons, we respectfully request that the Court grant this motion for a reduction in sentence and re-sentence him to time served, allowing him to immediately begin supervised release in home confinement. Alternatively, we request that this Court allow Mr. Lucre to finish the balance of his prison sentence in home confinement, and starting supervised release immediately thereafter. Further, Mr. Lucre does not object to this Court modifying his term of supervised release to include home confinement for the period of time equal to the remaining term of incarceration he would serve without this Court's modification order.

DATED:        May 15, 2020                              _____/s/_____
              New York, New York                        David J. Cohen, Esq.
                                                        Cohen Forman Barone, LLP.
                                                        950 Third Avenue, 11th Fl.
                                                        New York, New York 10022



234 East 149th Street
Bronx, NY 10451

January 2, 2018

To Whom It May Concern:

This letter is written on behalf of patient, Benjamin Lucre (D.O.B. 4/7/00). Patient is presently admitted to our pediatric intensive care unit (PICU) with no indicated discharge date.

Sincerely,

Priscilla Collado, LMSW
Social Services
718-579-5281

EmblemHealth®

55 Water Street, New York, New York 10041-8190

January 19, 2018

BENJAMIN LUCRE
2164 2ND AVE APT 4A
NEW YORK, NY 10029

109

## Approval Letter

| | |
|---|---|
| Member Name: | BENJAMIN LUCRE |
| Member ID #: | 13573376 |
| Reference #: | 0012850686 |
| Date of Service(s): | January 2, 2018 |
| Requesting Provider: | LINCOLN HOSPITAL |
| Servicing Provider: | Rajan Khanna |
| Provider Network Status: | Participating |
| Facility: | Lincoln Hospital |
| Type of Service: | Inpatient Hospital |
| Type of Review: | Concurrent |
| Type of Plan: | Health Maintenance Organization |
| Plan Name: | HIP Health Plan of New York (HIP) |
| Underwriting Entity: | HIP |

Dear BENJAMIN LUCRE :

At HIP, we make every effort to provide you with access to a wide range of quality health care services for your needs. Approval for a treatment or service is based on some important conditions.

This letter is an approval for **Inpatient Hospital/Medical Care** from the provider listed in this letter.

Group Health Incorporated (GHI), HIP Health Plan of New York (HIP), HIP Insurance Company of New York and EmblemHealth Services Company, LLC are EmblemHealth companies. EmblemHealth Services Company, LLC provides administrative services to the EmblemHealth companies.



Benjamin Lucre
2164 SECOND AVE APT 4 A
NEW YORK NY 10029

Today's date:1/23/18
Patient DOB: 04/07/2000
Patient MRN: 5147949
Patient Phone No: (917)915-5854
Insurance Payer: HIP CAP
Referral No: 3105213

**Dear Benjamin Lucre:**

Your physician has referred you to the Provider or Practice indicated below.  Please be sure to bring this referral letter and any other documentation provided by your physician to your appointment.

- If referral authorization is required by your insurance coverage, our office will obtain the referral authorization number and will provide it **directly** to the provider/practice listed below.  Providers can also obtain this information directly from your insurance company.

**Dear Specialist:**

As we strive to manage our patient's medical care timely, we are requesting a **consultation report** from all our consultants within **5-10 days**.  We appreciate hearing from you regarding the diagnosis and treatment recommendations.

I will review your consultation report before submitting a follow-up referral.  Please be aware that your report is required for all patients before approving subsequent visits.  (Physical therapy notes must include patient progress and suggestions for continued treatment.)

I thank you in advance for assisting me with the the care of our patient.

Sincerely, RIGMOR E SPANG, MD

| | |
|---|---|
| **Referring Provider address:** | 215 East 95th Street  New York,   NY 10128 |
| **Referring Provider  Phone:** | 212-423-3457 |
| **Referring provider NPI Number:** | 1801993936 |

**REFERRAL DETAILS**

**Referred To Specialist**
**Specialty:** Pediatric Pulmonology
**Referred to:** Hedi Leistner

**Phone:** 212-263-7478

**Number of visits:**   3
**Auth Number:**   P0012888489023
**Referral start Date:** 01/22/2018
**Referral end Date:**  07/21/2018

**Physician Instruction/Notes:**
Schedule Appointments before:2/21/2018
Severe Unstable Asthma, Non Compliant
Teenager/ Please Evaluate, Guide,

**Requested**
Procedures:
AMB REFERRAL TO PEDIATRIC PULMONOLOGY [REF82]
(1671321P) Leistner, Hedi L.
212-263-7478

Diagnoses:
  J45.50 (ICD-10-CM) - Severe persistent
asthma, unspecified whether complicated

**Electronically signed by:**  RIGMOR E SPANG, MD
**Authorized by:**        RIGMOR E SPANG, MD
 **Disclaimer:**This authorization does not guarantee payment of benefits or verify eligibility. Payment of benefits associated with this referral is subject to all contract terms, conditions, limitations, and exclusions of the member's contract.